**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RACHEL HOWARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20-CV-274 RLW |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on review of an adverse ruling by the Social Security Administration.  The Court has jurisdiction over the subject matter of this action under 42 U.S.C. § 405(g).  Plaintiff filed a brief in support of the Complaint (ECF No. 23) and Defendant filed a brief in support of the Answer (ECF No. 26).  The Court has reviewed the parties' briefs and the entire administrative record, including the transcripts and medical evidence.  Based on the following, the Court finds the Commissioner's final decision is not supported by substantial evidence on the record as a whole, and the case will be reversed and remanded for further proceedings.

### I.  Nature of Action and Prior Proceedings

Plaintiff filed this case under 42 U.S.C. § 405(g) for judicial review of Defendant's final decision denying Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.

---

[1]Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted for Andrew Saul as the Defendant in this suit.  See 42 U.S.C. § 405(g).

On June 8, 2016, Plaintiff protectively filed an application for DIB. (Tr. 16, 183)  In her application, Plaintiff stated she was born in 1981 and alleged that she became disabled on December 12, 2015 (Tr. 183). Plaintiff submitted a disability report in connection with her application (Tr. 200-207). In the disability report, Plaintiff alleged disability due to multiple back issues, including disc extrusions at multiple levels of the lumbar spine and thoracic spine, a lumbar disc protrusion "at L5-S1," "moderate to advanced degenerative disc disease throughout," "nerve root problems in [the] lumbar spine," bone spurs in the lumbar spine, and nerve damage in the left leg (Tr. 201).

On  August 10, 2016, Defendant issued a Notice of Disapproved Claims. (Tr. 85)  On September 16, 2016, Plaintiff filed a timely Request for Hearing by Administrative Law Judge (ALJ). (Tr. 92)  After a hearing on September 4, 2018, Administrative Law Judge ("ALJ") Kellie Wingate Campbell issued an unfavorable decision dated February 14, 2019. (Tr. 13-30)  On March 25, 2019, Plaintiff filed a timely Request for Review of Hearing Decision with the Social Security Appeals Council. (Tr. 178-9)  On January 10, 2020, the Appeals Council denied Plaintiff's request for review (Tr. 1) and the decision of the ALJ became Defendant's final decision.  Plaintiff has exhausted administrative remedies.

## II.  Legal Standard

The Act defines as a disability the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).   The impairment or impairments must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work."  42 U.S.C. §§ 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  20 C.F.R. §§ 404.1520(a), 416.920(a)(1); see also McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  First, the Commissioner considers the claimant's work activity.  If the claimant is currently engaged in "substantial gainful activity," the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); McCoy, 648 F.3d at 611.

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see whether the claimant has a severe physical or mental impairment or combination of impairments.  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); see also 20 C.F.R. § 416.920(a)(4)(ii).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007); see also 20 C.F.R. §§ 416.920(c), 416.920a(d). If the claimant does not have a severe impairment, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii); McCoy, 648 F.3d at 611.  At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 404.1520(a)(4)(iii); McCoy, 648 F.3d at 611.  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process.  20 C.F.R. § 404.1520(d); McCoy, 648 F.3d at 611.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(5)(i).  "RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 912 (8th Cir. 2011); see also 20 C.F.R. § 416.945(a)(1).  While an RFC must be "based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," it is nonetheless an administrative assessment—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." Boyd v. Colvin, 831 F.3d 1015, 1020 (8th Cir. 2016).  Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).  Ultimately, the claimant is responsible for *providing* evidence relating to his RFC, and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3).  If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled.  20 C.F.R. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work that exists in significant numbers in the national economy shifts to the Commissioner.  See Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v).  If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the

Commissioner finds the claimant not disabled.  20 C.F.R. § 416.920(a)(4)(v).  If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled.  Id.  At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant.  Hensley, 829 F.3d at 932.

If substantial evidence on the record as a whole supports the Commissioner's decision, the Court must affirm the decision.  42 U.S.C. §§ 405(g); 1383(c)(3).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoted case omitted).  "[T]he threshold for such evidentiary sufficiency is not high."  Id.  Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision."  Reece v. Colvin, 834 F.3d 904, 908 (8th Cir. 2016).  The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence."  Id.  The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently."  KKC ex rel. Stoner v. Colvin, 818 F.3d 364, 370 (8th Cir. 2016) (quotation marks and quoted case omitted).

## III.  The ALJ's Decision

Applying the foregoing five-step analysis, at Step 1, the ALJ found that Plaintiff has not performed substantial gainful activity since the alleged onset date of disability on December 12, 2015. (Tr. 19)  At Step 2, the ALJ found that Plaintiff's severe impairments are degenerative disk disease, status-post laminectomy/lumbar fusion, and post-laminectomy syndrome.[2] (Tr. 19)  At

---

[2]Laminectomy is defined as, "Excision of a vertebral lamina; commonly used to denote removal of the posterior arch."  Laminectomy, Stedman's Medical Dictionary 1046 (17th ed.).  "Post-laminectomy syndrome (PLS), or 'Failed Back Surgery Syndrome' (FBSS), is defined by the International Association for the Study of Pain (IASP) as back pain, with or without referred or radiating pain, that is located mainly

Step 3, the ALJ found that Plaintiff does not have an impairment or combination of impairments

that meets or medically equals an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

(Tr. 19)  The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform

sedentary work:

> except the claimant may never climb ladders, ropes or scaffolds or be exposed to
> unprotected heights or hazardous work environments.  She can occasionally climb
> stairs or ramps and frequently balance and occasionally stoop, crouch, kneel or
> crawl.  The claimant must avoid concentrated exposure to vibration and may
> perform occasional overhead reaching bilaterally.  She may stand five minutes
> hourly while remaining on task. (Tr. 20)

At Step 4, the ALJ found that Plaintiff can perform past relevant work as a telephone operator. (Tr.

23)  In the alternative, at Step 5, the ALJ found "there are other jobs that exist in significant

numbers in the national economy that the claimant also can perform." (Tr. 24)

## IV. Discussion

Plaintiff challenges the ALJ's decision as not supported by substantial evidence on the

record as a whole. (ECF No. 13 at 11.)  Specifically, Plaintiff contends the ALJ's decision is not

supported by substantial evidence because (1) the ALJ failed to properly evaluate opinion evidence

from Plaintiff's treating neurosurgeon, Dr. Kennedy, because she did not give his opinions

controlling weight or offer good reasons to discredit them; and (2) the ALJ erred in determining

---

in the lower limbs, is of unknown origin and persists or begins after surgical procedures are performed to
treat lumbar disc herniations."  João Batista Santos Garcia, et al., "Clinical evaluation of the post-
laminectomy syndrome in public hospitals in the city of São Luís, Brazil,"
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4574019/ (last visited Sept. 9, 2021) (footnote citations
omitted).  See also William F. Micheo, M.D., et al., "Post-laminectomy pain," American Academy of
Physical Medicine and Rehabilitation https://now.aapmr.org/post-laminectomy-pain/ (last visited Sept. 9,
2021) ("Post-laminectomy pain, also called failed back surgery syndrome (FBSS), is used to describe
patients that present with persistent or recurring low back pain, with or without referred pain to the lower
extremities, following one or more spine surgeries.  Therefore, the outcome of the spinal surgery does not
meet the expectation of the patient or surgeon.").

Plaintiff's RFC because she did not include Plaintiff's limitations as described by Dr. Kennedy, which the vocational expert testified would preclude competitive employment.

For the following reasons, the Court finds the ALJ's decision is not based on substantial evidence and is therefore not consistent with the Social Security Administration Regulations and case law.

A. The Opinion of Dr. David G. Kennedy, M.D.

Plaintiff asserts the ALJ erred in failing to give the medical opinion of treating neurosurgeon Dr. David G. Kennedy, M.D. controlling weight. See 20 C.F.R. § 404.1527(c)(2); Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015.) When an ALJ evaluates opinion evidence for claims filed before March 27, 2017, as here, a "treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Reece, 834 F.3d at 908-09 (quoted case omitted). "Although a treating physician's opinion is usually entitled to great weight, 'it do[es] not automatically control, since the record must be evaluated as a whole.'" Id. at 909 (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)). "A treating physician's own inconsistency may undermine his opinion and diminish or eliminate the weight given his opinions." Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015) (internal punctuation, quotation marks and quoted case omitted). Whether the ALJ gives the opinion of a treating physician great or little weight, she is required to "'always give good reasons' for the weight afforded to a treating physician's evaluation." Nowling v. Colvin, 813 F.3d 1110, 1123 (8th Cir. 2016) (quoting Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005)); see 20 C.F.R. § 404.1527(c)(2) (the ALJ "will always give good reasons in [the hearing decision] for the weight [given to the] treating source's opinion.").

Dr. Kennedy is Plaintiff's "treating" neurological surgeon.  See 20 C.F.R. § 404.1502.  Dr. Kennedy performed two back surgeries on the same lumbar disks during Plaintiff's period of claimed disability (Tr. 394, 474), that ultimately resulted in diagnosis of post-laminectomy syndrome.  On February 12, 2018, Dr. Kennedy completed a medical source statement form in which he confirmed that his first contact with Plaintiff was March 20, 2007.  Dr. Kennedy currently treats Plaintiff for post-laminectomy syndrome, lumbar, and sees her every six to eight weeks. (Tr. 406)

Dr. Kennedy opined that Plaintiff has the following limitations: in total, she can sit "about" two hours in an eight-hour workday, and can stand or walk "about" two hours in an eight-hour workday.  (Tr. 406)  She must include periods of walking around during the workday; would need a job that permits shifting positions at will from sitting, standing, or walking; and would need to take unscheduled breaks one or two times per eight-hour workday for 10 to 15 minutes at a time. (Tr. 406)

Dr. Kennedy opined that Plaintiff can occasionally lift ten pounds or less, and less than occasionally lift twenty pounds.[3]  He stated that Plaintiff should never twist, stoop/bend, crouch, or climb ladders but may occasionally climb stairs.  (Tr. 406)  She can occasionally reach in all directions, handle (gross manipulation), finger (fine manipulation), and feel.  (Tr. 407).  Dr. Kennedy opined that Plaintiff's experience of pain would seldom be severe enough to interfere with attention and concentration, and she had a slight limitation in the ability to deal with work stress.  (Tr. 407).  Plaintiff's impairment is likely to produce good days and bad days.  (Tr. 407)

---

[3]The instructions on a portion of a form that Dr. Kennedy filled out do not correspond fully to the form itself.  The instructions state in relevant part, "For the next three questions, 'rarely' means 1% to 5% of an 8-hour working day; 'occasionally' means 6% to 33% of an 8-hour working day; 'frequently' means 34% to 66% of an 8-hour working day." (Tr. 406)  The subsequent questions offer the following options: Never, Less than Occasionally, Occasionally, and Frequently.  (Tr. 406)  The Court understands the option "Less than Occasionally" to correspond to "rarely," meaning 1% to 5% of an 8-hour working day.

Dr. Kennedy also opined that Plaintiff would be expected to be off-task more than ten percent but less than twenty percent of an eight-hour workday, she would need redirection one or two times per week, and she would be expected to miss "about" two days of work per month secondary to her impairments. (Tr. 407).  In response to the question, "Based on your examination, would the claimant have difficulty working a full-time job on a sustained basis?  Please explain:" Dr. Kennedy answered "no."  (Tr. 407)  In support of his conclusions, Dr. Kennedy stated Plaintiff "[n]eeds more therapy to be able to increase activities of daily living and work capability.  See PT notes." (Tr. 407)

At the administrative hearing, the vocational expert testified there are no competitive jobs available for an individual who is limited to sitting two hours and standing/walking two hours in an eight (8)-hour workday. (Tr. 67)  The vocational expert also testified there are no competitive jobs available for an individual who is consistently absent two days per month. (Tr. 68)  Plaintiff asserts that based on Dr. Kennedy's opinion, she cannot sustain competitive employment.  She further asserts that Dr. Kennedy's opinion should be entitled to controlling weight because it is well supported by the clinical and diagnostic findings and is not inconsistent with the other substantial evidence of record.

The ALJ gave "some weight" to Dr. Kennedy's treating source statement, finding it "somewhat internally inconsistent."  (Tr. 22).  The ALJ said Dr. Kennedy opined that Plaintiff's prognosis was good and that she would not have difficulty sustaining full-time employment, but he also opined that she had some limitations due to her pregnancy and would need to elevate her legs, would be off task over 10% of the day, and would need one or two ten- to fifteen-minute breaks along with additional therapy.  (Id.)  The ALJ stated it was "unclear how much of these limitations were related to Plaintiff's pregnancy," but stated Dr. Kennedy's progress notes

9

indicated improvement, and cited as an example in June 2018, shortly after her caesarean section, Plaintiff reported some back discomfort and lower lumbar pain but no leg pain, and lumbar imaging revealed satisfactory lateral bone mass material and a stable fusion.  (Id. at 22-23.)  The ALJ then stated,

> The claimant cares for her infant during the day and drove an hour to the hearing without stopping while her husband, who is also able to drive, rode as a passenger. While her ailments are severe, in reviewing the record as a whole, they are reasonably accommodated by the reduction to sedentary work with additional limitations as discussed.

(Id. at 23.)[4]  ALJ also said the record contains multiple advisements for Plaintiff to be off of work, but found these "appear to be temporary restrictions during [her] pregnancy and are certainly not indicative of the claimant's functioning throughout the period under consideration," so the ALJ gave them no weight.  (Id.).

Although the ALJ stated that she gave Dr. Kennedy's opinion "some weight," it is not clear what aspects of his opinion the ALJ credited.  The ALJ did not incorporate into the RFC any of Dr. Kennedy's limitations with respect to Plaintiff's ability to lift, sit, require unscheduled breaks, twist, stoop/bend, or crouch.  The Court must determine whether the ALJ articulated "good reasons" for the weight she afforded to Dr. Kennedy's opinion.  See 20 C.F.R. § 404.1527(c)(2). The Court concludes the ALJ did not.

As a threshold matter, there is no evidence in the record to show the amount of understanding that Dr. Kennedy, a neurosurgeon, has of Social Security disability programs and their evidentiary requirements.  See 20 C.F.R. § 404.1527(c)(6).  It is apparent that Dr. Kennedy's

---

[4]The ALJ mentioned six times in the ten-page Decision that Plaintiff is able to drive herself places, and mentioned four times that Plaintiff drove for an hour to the hearing with her husband in the passenger seat although he was also able to drive.  The ALJ appears to place significant weight on Plaintiff's ability to drive for one hour although she never articulated how this factored into her determination that Plaintiff was not disabled, or that it indicated an inconsistency in the record.

conclusory opinion Plaintiff would have no difficulty working a full-time job on a sustained basis does not comport with his opinions that Plaintiff (1) could not sit or stand for more than about two hours each per workday, (2) must include periods of walking around during the workday, (3) would need a job that permits shifting positions at will from sitting, standing, or walking, (4) would need to take unscheduled breaks one or two times per eight-hour workday for 10 to 15 minutes at a time; and that Plaintiff's impairments would cause her to be absent from work about twice a month.  Dr. Kennedy's specific opinions as to Plaintiff's limitations, however, are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record.  Reece, 834 F.3d at 908-09.

The following objective imaging supports Dr. Kennedy's opinion, as required by 20 CFR § 404.1527(c)(2).  A December 12, 2015 MRI of the lumbar spine revealed, among other things, L4-5 advanced degenerative disk disease and moderate-sized disk extrusion which deviates the left L5 nerve root; and L5-S1 moderate degenerative disk disease and soft tissue disk extrusion which deviates the left S1 nerve root.  (Tr. 317)  A January 26, 2016 post-myelogram CT of the lumbar spine revealed left disk herniation L4-5 with slight inferior migration and associated with large disk herniation into the left neural foramen extending fairly far peripherally.  There is degenerative encroachment upon the upper lateral recesses of S1, a little more prominent to the left. (Tr. 385)

On February 19, 2016, Dr. Kennedy performed a L4-5 microdiscectomy to treat herniated nucleus pulposus L4-5, left.  (Tr. 394)  Nonetheless, thereafter an August 1, 2016 lumbar discography revealed concordant symptomatic response elicited at each lumbar level.  The most severe pain was elicited at the L3-4 level. (Tr. 467-8)  A June 9, 2017 MRI of the lumbar spine revealed, among other things, L4-5 laminectomy changes with left foraminal disk fragment and

facet arthropathy contributing to severe left foraminal stenosis and encroaching the left exiting L4 nerve root; and L5-S1 left paracentral foraminal disk osteophyte complex contributing to severe left lateral recess stenosis. (Tr. 465)

On June 14, 2017, based on the June 9, 2017 MRI, which demonstrates a large recurrent disk herniation at L4-5, Dr. Kennedy opined that Plaintiff needed a two-level decompression. (Tr. 445)  On July 21, 2017, Dr. Kennedy performed a laminectomy at L4-5 and L5-S1 with bilateral foraminotomies, pedicle screw fixation L4 to S1, posterolateral fusion L4 to S1, and iliac crest bone marrow aspiration, to treat persistent lumbar radiculopathy with severe foraminal encroachment L4-5, L5-S1.  (Tr. 474)  The back surgeries on February 19, 2016 (Tr. 394) and July 21, 2017 (Tr. 474) to treat recurrent herniation of the same lumbar disks support Dr. Kennedy's opinion.

Substantial evidence supports Dr. Kennedy's opinion.  On January 1, 2016, Dr. Kennedy confirmed he had last treated Plaintiff in 2007.  Her pain has become progressively more severe since then and she has not responded to a series of treatments, including physical therapy (PT), chiropractic treatments and ongoing pain injections from a pain management physician, Dr. Guarino.  The most recent injections in November 2015 provided little or no results.  On physical examination, Dr. Kennedy observed range of motion of the lumbar spine is significantly reduced in forward flexion and positive straight leg raise ("SLR"), left.[5]  (Tr. 380)   Dr. Kennedy recommended lumbar myelogram in advance of operative interventions. (Tr. 381)

---

[5]"The straight leg raise test . . . is a fundamental neurological maneuver during the physical examination of the patient with lower back pain aimed to assess the sciatic compromise due to lumbosacral nerve root irritation."  "It aims to assess for lumbosacral nerve root irritation.  This test can be positive in a variety of conditions, though lumbar disc herniation is the most common."  National Center for Biotechnology Information, "Straight Leg Raise Test," https://www.ncbi.nlm.nih.gov/books/NBK539717/ (last visited Sept. 9, 2021).

On March 29, 2016, Dr. Kennedy confirmed that Plaintiff has been on Percocet from pain management for ten (10) years.  Plaintiff reports improved pain overall, status-post laminectomy, but still has trouble standing and sitting for any length of time.  Plaintiff still has herniated disks causing back pain, hence the need for Percocet. (Tr. 369)  Plaintiff is to start PT. (Tr. 375)

Although in May 2016, Sejal Patel, Nurse Practitioner at Dr. Kennedy's office, returned Plaintiff to work with no restrictions (Tr. 368, 372), by July 6, 2016, Nurse Practitioner Patel wrote, "[Plaintiff] is to remain off work." (Tr. 458)  In addition, Dr. Kennedy repeatedly advised the insurance adjuster in the workers' compensation claim that Plaintiff should remain off work. (Tr. 375, 412, 419, 424, 433, 546)  This is consistent with Dr. Kennedy's medical source statement. The ALJ's conclusion that Dr. Kennedy's orders for Plaintiff to remain off work were restricted solely to the time of her pregnancy is clearly erroneous.

On July 6, 2016, Nurse Practitioner Patel confirmed that Plaintiff's pain is primarily in her central back, which reaches a pain level as high as 8/10. The pain is aggravated by prolonged sitting and standing.  Lying down alleviates the pain.  Plaintiff reports that the left outer aspect of her leg goes numb at times.  On physical examination, Nurse Practitioner Patel observed decreased range of motion with forward flexion and sensory loss along the outer aspect of the leg, consistent with Plaintiff's report. Nurse Practitioner Patel wrote, "[Plaintiff] is to remain off work.  We will discuss the findings above with Dr. Kennedy, we will likely pursue a lumbar discogram at L3-4, L4-5 and L5-S1 as I believe the patient has discogenic pain and this needs to be evaluated further." (Tr. 458)

On August 1, 2016, lumbar discography confirmed concordant symptomatic response elicited at each lumbar level, with the most severe pain elicited at the L3-4 level.[6] (Tr. 467-8)  The

---

[6]Discography, also known as a discogram, is an interventional diagnostic test that uses imaging guidance to direct an injection of contrast material into the center of one or more spinal discs, which can

discography provides objective evidence to support Plaintiff's allegations of continued pain and difficulty standing and sitting status-post laminectomy.

On October 19, 2016, Plaintiff reported walking 10 to 15 minutes at a time with daily back and hip pain.  Sitting aggravates the pain.  Dr. Kennedy noted some sensory loss on the left side. He prescribed Voltaren and weight loss.  Work status is "off work." (Tr. 419)

On January 17, 2017, Dr. Kennedy wrote, "[Plaintiff's] previous discogram demonstrated concordant pain at multiple levels. I think this is likely due to the fact that she does have some degree of internal disk derangement. Right now I do not think that she needs any type of operative intervention. She will continue exercises as tolerated." (Tr. 449)

On June 1, 2017, Plaintiff reported constant pain in the right buttock and left lateral leg, numbness in the right thigh and difficulty walking.  (Tr. 416)  Dr. Kennedy prescribed Percocet and Flexeril.  On physical examination, Dr. Kennedy observed range of motion of the lumbar spine is significantly reduced and SLR is equivocally positive.  He wrote, "[Plaintiff's] symptoms suggest recurrent sciatica" and to schedule an MRI of the lumbar spine. (Tr. 446)

Dr. Kennedy referred plaintiff for an MRI with and without contrast on June 6, 2017.  (Tr. 491).  The MRI showed marked narrowing of the L4-L5 intervertebral disc; mild spur formation both posteriorly and anteriorly; marked narrowing of the L5-S1 disc space with vacuum gas phenomena, and degenerative spur formation noted at this level.  Sclerosis is noted in the posterior elements of the lower lumbar spine.  The impression was spondylosis with degenerative disc disease at L4-L5 and L5-S1. (Tr. 476)

On June 14, 2017, Dr. Kennedy concluded the June 9, 2017 MRI "demonstrates a large recurrent disc herniation at L4-5 with severe foraminal encroachment as well as a disc herniation

---

temporarily reproduce back pain symptoms and is used to help identify the source of back pain.  See https://www.medicinenet.com/discography_discogram/definition.htm (last visited Sept. 9, 2021).

at L5-S1 again with severe left foraminal encroachment." (Tr. 445)  He recommended a two-level decompression with pedicle screw fixation. (Tr. 445)  On June 22, 2017, Dr. Kennedy prescribed Orthofix Lumbar Bone growth stimulator (PEMF) for 2-4 hours per day. (Tr. 490)

On July 21, 2017, Dr. Kennedy performed a laminectomy on Plaintiff's spine at L4-5, L5-S1 with bilateral foraminotomies; pedicle screw fixation L4 to S1; Posterolateral fusion L4 to S1, and iliac crest bone marrow aspiration.. (Tr. 474)

On July 31, 2017, Plaintiff reported deep numbness in the left buttock and down her left leg. Nurse Practitioner Patel noted it is too early to determine what this means. He told Plaintiff to "hold off" wearing LSO brace as this may increase the drainage output from the incision. (Tr. 439) On August 4, 2017, Plaintiff reported slight improvement in her left buttock numbness. Nurse Practitioner Patel advised Plaintiff to continue wearing the bone-growth stimulator. (Tr. 436)  On August 30, 2017, Plaintiff reported left buttock pain and posterior thigh pain. (Tr. 412) Nurse Practitioner Patel prescribed Gabapentin for neuropathy pain. He refilled Percocet. He advised Plaintiff to continue wearing the back brace and bone-growth stimulator.  She was to remain off work in the interim. (Tr. 433)  Dr. Kennedy diagnosed post-laminectomy syndrome. (Tr. 488)

Dr. Kennedy's diagnosis of post-laminectomy syndrome, i.e., chronic pain syndrome or failed back surgery, following the second back surgery he performed on Plaintiff, supports a finding that Dr. Kennedy determined Plaintiff's allegations of pain and limitation are medically credible.  Plaintiff also has a long history of treatment with pain management, injections, and drug therapy, including Dr. Kennedy's referral of Plaintiff to a new pain management doctor on September 27, 2018 for consultation, following her second back surgery and completion of numerous physical therapy sessions.  (Tr. 559)  These are objective facts supporting Plaintiff's

subjective complaints of chronic lower back pain.  See Cox v. Apfel, 160 F.3d 1203, 1207-08 (8th Cir. 1998).

Dr. Kennedy's opinions as to Plaintiff's limitations are also supported by the physical therapy notes, which his medical source statement specifically references along with his opinion that Plaintiff needs more therapy to be able to increase activities of daily living.  (Tr. 407)

On or about October 17, 2017, Plaintiff found out she was pregnant.  She reported deep pain in the tailbone with increased walking and extreme tightness and stiffness in the left leg since surgery. (Tr. 411)  Dr. Kennedy advised this is probably mostly muscular and should respond to physical therapy ("PT").  He prescribed aqua-therapy (Tr. 430) and diagnosed post-laminectomy syndrome. (Tr. 487)

On November 29, 2017, Plaintiff is currently in aqua-therapy and is pregnant. (Tr. 410) Nurse Practitioner Patel confirmed that Plaintiff's range of motion with her right leg is improved, such that she is now able to lift her right leg to be able to tie her shoes.  (Tr. 427)  She is still having "quite a bit of issues" with the left hip, decreased range of motion, with quite a bit of stiffness and tightness in her left lower extremity.  On physical examination, Nurse Practitioner Patel observed limited range of motion of the left hip and weak left hip flexors.  Plaintiff is advised to continue PT, progressing to land therapy, and use heat therapy. (Tr. 427)  Plaintiff is to remain off of work from November 29, 2017, until January 11, 2018.  (Tr. 483)

On January 4, 2018, Megan Brusca, Doctor of Physical Therapy, prepared a progress report after Plaintiff attended 20 PT sessions.  (Tr. 503-505)  Plaintiff reported her overall walking improved, with tolerance only around 10-15 mins, but better stride length.  Plaintiff's sitting tolerance is 30 minutes and standing is 10 minutes.  Her biggest improvement is in stride length and ability to lift her left leg better.  Plaintiff's biggest issues are bending, lifting, and being able

to walk for a longer period of time, and chief complaints are impaired walking, weakness, pain, and decreased activities of daily living ("ADL") tolerances.   Plaintiff's average pain is 3/10 fluctuating with activity during the day, with 7/10 the worst pain and 3/10 the best.  Her goal is to return to some type of work.  Ms. Brusca observed shuffled gait, decreased stride length, absent heel strike; and palpation indicated hypertonicity (resting muscle tone greater than the amount needed to maintain joint posture) of the lumbar PVMS (paravertebral muscles).  (Tr. 503)

Ms. Brusca summarized that Plaintiff continues to make improvements in strength and ability to ambulate with improved stride length, but she could benefit from PT to address hip/lumbar spine disassociation during ambulation, lower extremity strengthening, and core strengthening.  Her level of effort during treatment was good.  (Tr. 504)  Plaintiff's scores on standardized questionnaires indicate severe perceived disability, and her musculoskeletal limitations that affect essential job demands are weakness, impaired gain, pain, neural tension, decreased lumbar/lower extremity mobility.  Ms. Brusca found Plaintiff's prognosis for recovery and return to pre-morbid work status to be good. (Id.)

As of January 4, 2018, Plaintiff's short term physical therapy goals (to be achieved in 3 weeks) were:

> 1. Worker will be independent in a home exercise program. - MET
> 2. Worker to decrease pain complaints to 5-6/10, since increasing activity level, to improve her tolerance for ADLs – PROGRESSING.
> 3. Worker to increase her [hamstring] 90/90 length by 10-15 degrees to decrease the strain on her lumbar spine – PROGRESSING
> 4. Worker to improve her tolerance for walking with a heel to toe gait pattern to avoid shuffling and decrease her fall risk. – MET

(Tr. 505)

Plaintiff's long term physical therapy goals (to be achieved prior to discharge) were:

> 1. Worker to improve her [hamstring] length by 15-20 degrees to improve tolerance for upright standing for standing based activities. - PROGRESSING

2. Worker to increase lifting/carrying ability to 10 lbs. to improve her tolerance for light work and caring for her future newborn. – PROGRESSING

3. Worker to display a [negative left straight leg raise] to reduce neural tension in her [lower extremities] and improve her tolerances for ADLs and work related activities. - MET

4. Worker will improve their [lower extremity] gross strength to at least 4+/5 muscle grade to improve the ability to perform their functional activities. – MET

5. Worker will improve their Oswestry score to below 40% to assist the patient in leading a more active lifestyle and be able to return to work.[7] – PROGRESSING

(Tr. 505)  Thus, as of January 2018, following her two back surgeries, Plaintiff was progressing toward but had not achieved the ability to lift/carry ten pounds.

On January 11, 2018, Dr. Kennedy advised Plaintiff to continue PT and remain off work. Plaintiff was making progress with PT, her hamstrings are more flexible, and overall she is making gradual improvement.  (Tr. 409, 424)  On February 7, 2018, PT notes state Plaintiff was getting progressively stronger but reports increased pelvis pain with sitting, lying down, and standing, and is unable to walk on the treadmill at the same pace due to pelvic pain.  (Tr. 518)  On February 16, 2018, PT notes state Plaintiff's hips and tailbone were "pretty sore."  (Tr. 518)  On February 21, 2018, PT notes state Plaintiff leaned over while getting dressed for PT and felt a spasm and sharp pain in her left lower back region and is unable to stand up straight since then.  (Tr. 522)

Megan Brusca, DPT, prepared a second PT progress report on February 23, 2018, after Plaintiff completed 20 more PT sessions.  The evaluation summary is that plaintiff is

continuing to make slow gradual improvements in her strength and ability to ambulate with an improved stride length.  She had a setback this week after an increase in pain while putting her pants on.  She reports her low back seems more painful and vulnerable right now because she has to lay on her side secondary to her current pregnancy.  The patient has no radicular pain or [numbness/tingling] as a result from her flare in symptoms this week.  Her lumbar/hip dissociation is

---

[7] "The Oswestry Disability Index (also known as the Oswestry Low Back Pain Disability Questionnaire) is an extremely important tool that researchers and disability evaluators use to measure a patient's permanent functional disability.  The test is considered the 'gold standard' of low back functional outcome tools."  See https://www.rehab.msu.edu/_files/_docs/Oswestry_Low_Back_Disability.pdf (citing Fairbank JC, Pynsent PB. The Oswestry Disability Index. Spine 2000 Nov 15;25(22):2940-52; discussion 52.) (last visited Sept. 9, 2021).

> improving, but she still demonstrated increased lumbar rotation during ambulation that she is able to correct with feedback from the therapist.  She could benefit from physical therapy to address hip/lumber spine disassociation, [lower extremity] strengthening, and core strengthening along with pain management techniques.

(Tr. 526)  Ms. Brusca evaluated Plaintiff's rehabilitation potential as "good potential towards addressing physical and functional limitations.  Consistent and good effort demonstrated."  (Id.) Plaintiff's short-term and long-term physical therapy goals, and her progress toward them, remains the same as on January 4, 2018.  Thus, Plaintiff was still progressing toward but had not achieved the ability to lift/carry ten pounds.

On March 7, 2018, Dr. Kennedy discontinued PT secondary to Plaintiff's pregnancy. Dr. Kennedy recommended no work from March 7, 2018 through May 7, 2018.  He stated that Plaintiff has not reached maximum medical improvement ("MMI"). (Tr. 546)

On July 5, 2018, Plaintiff resumed PT six weeks after the birth of her baby. This is consistent with Dr. Kennedy's opinion that Plaintiff needs additional PT. (Tr. 407)  On July 5, 2018, on physical examination, Megan Brusca, DPT, observed positive SLR, bilateral, (Tr. 548) and formal range-of-motion measures appear consistent with observed functional motion in the clinic. (Tr. 548)  On physical examination, Ms. Brusca observed unbalanced musculature of the postural muscles with soft tissue restrictions; decreased hip mobility; pelvic obliquity; impaired gait; pain; decreased range of motion; impaired posture; decreased ADL tolerance; and decreased strength. (Tr. 549)  Plaintiff's current pain level is 7/10, her best is 4/10, and the worst is 9/10.  (Tr. 547)

On August 16, 2018, Plaintiff reports improvement in lower extremity numbness along the hip and outer thigh, but continued pain in the tailbone and low back. Walking tolerance is improving.  Plaintiff is still limited to thirty (30) minutes of sitting on a cushioned seat, which is a thirty percent (30%) improvement since starting PT. (Tr. 551)  Plaintiff's current pain level was

7/10, the best was 5/10, and the worst was 9/10.  (Id.)  On physical examination, Dr. Brusca observed positive SLR, right, (Tr. 552) and formal range-of-motion measures appear consistent with observed functional motion in the clinic.  Plaintiff continues to struggle with sitting and walking tolerance, symptomatic reports and core weakness.  Ms. Brusca observed unbalanced musculature of the postural muscles with soft tissue restrictions; decreased hip mobility; impaired gait; weakness, pain; decreased range of motion; poor posture; decreased ADL tolerance; and decreased flexibility. (Tr. 553)  Plaintiff's short term PT goals and her progress status on these remain the same as stated above.  (Tr. 554)  Plaintiff's long term PT goals are modified to increase her lifting/carrying ability to 20 lbs., to improve her tolerance for light work and caring for her son, although there is no indication Plaintiff met the prior 10-lb. goal; and a new goal is added of improving walking tolerance to 20-30 minutes, with pain management techniques, to improve her ability to be active.  (Id.)  While Plaintiff continued to meet the long-term goals for lower extremity strength and negative SLR on her left leg, she was still progressing as to goals of improving hamstring length, increasing lifting and carrying abilities to 20 lbs., improving her Oswestry score to below 40%, and increasing walking tolerance.  (Id.)

A PT progress report of September 18, 2018 is based on another 18 PT sessions. (Tr. 555) Plaintiff reports left lower extremity numbness has improved, lifting tolerance overall is improving but pain in the tailbone has increased since Plaintiff's mother is not helping her as much. (Id.) Plaintiff's current pain level is 6/10; her best is 5/10, and worst is 7/10.  (Id.)  For the first time, Plaintiff had a negative SLR test.  (Tr. 557)  Ms. Brusca observed unbalanced musculature of the postural muscles with soft tissue restrictions; pelvic obliquity; weakness; impaired gait; pain; decreased range of motion; impaired posture; decreased ADL tolerance; decreased strength; and decreased flexibility. Oswestry score indicates severe perceived disability. (Tr. 557)  As of this

date, Plaintiff's short-term goals—which remained unchanged—are all met, but she was still progressing as to goals of improving hamstring length, increasing lifting and carrying abilities to 20 lbs., and improving her Oswestry score to below 40%. (Tr. 558)  Plaintiff had nearly met the increased walking tolerance to 20-30 minutes goal.  (Id.)

In the PT discharge report of September 27, 2018, Plaintiff reported difficulty lifting at home as her son is getting bigger and Plaintiff has difficulty with transitioning him in and out of the car with the pumpkin seat. (Tr. 559)  Plaintiff's current pain level is 7/10, her best is 4/10, and worst is 8/10.  (Id.)  Ms. Brusca notes Plaintiff has made overall improvements in her left lower extremity neutral tension and myotomal strength, and ADL tolerances but she continues to struggle with pelvic stabilization and overall core strength.  Plaintiff's exhibited level of effort was good during all current treatment sessions. (Tr. 561)  Plaintiff's course of PT is being discontinued per Dr. Kennedy as he was referring her to a new pain management doctor.  (Id.)  Ms. Brusca gave Plaintiff a home exercise program to continue to work on her muscular imbalances and overall stabilization.  Plaintiff was still progressing toward long-term goals of improving hamstring length, increasing lifting and carrying abilities to 20 lbs., and improving her Oswestry score to below 40%, as this was still at the severe perceived disability level.  Plaintiff had nearly met the increased walking tolerance to 20-30 minutes goal.. (Tr. 561)

The foregoing reveals there is extensive evidence in the PT record to establish Plaintiff's significant limitations, particularly as to her tolerance for sitting, standing, and lifting and carrying; the "slow gradual improvement" in her limitations, her continued reports of significant pain, and her ultimate failure to meet the long-term PT goals despite good effort over 40-plus sessions.  The ALJ did not cite any of this evidence, but instead stated generally that Dr. Kennedy's treatment notes showed "improvement," identifying as support one record from June 2018 when Plaintiff

reported "some back discomfort and lower lumbar pain but no leg pain."   (Tr. 22-23)
"[T]emporary improvement in a patient's symptoms post-operation does not necessarily equate to
long-term improvement.  Even if the two did equate, significant improvement in symptoms does
not reflect a *degree* of improvement that would warrant a conclusion that the patient's pain has
subsided sufficiently to enable resumption of work activity."  Koch, 4 F.4th at 665.  See also
Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (explaining the ALJ erroneously relied on
doctors' notes that their patient "was 'doing well,' because doing well for the purposes of a
treatment program has no necessary relation to a claimant's ability to work or to her work-related
functional capacity.").

The ALJ's reliance on lumbar imaging showing satisfactory lateral bone mass and a stable
fusion does not have any bearing on Plaintiff's diagnosis of post-laminectomy syndrome (Tr. 23),
and she fails to recognize or consider that Plaintiff still has moderate disc degeneration and disc
extrusions at T12-L1 and L3-4 (Tr. 317, 465) which can still cause pain.  "An ALJ has the
obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that
support a finding of non-disability while ignoring evidence that points to a disability finding."
Gaines v. Colvin, 8:15CV207, 2016 WL 617420, at *2 (D. Neb. Feb. 16, 2016) (quoting Denton
v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010)).

Dr. Kennedy's opinions as to Plaintiff's limitations are well supported by medically
acceptable clinical and other diagnostic techniques, and are not inconsistent with other substantial
evidence in the whole record.  Further, Dr. Kennedy is a specialist, a neurosurgeon who has treated
Plaintiff for a number of years, seeing her every six to eight weeks.  Dr. Kennedy has had numerous
objective diagnostic tests performed on Plaintiff, performed two surgeries on her spine, and

monitored her progress during a lengthy course of physical therapy.  See C.F.R. §  404.1527(c)
(factors used in deciding weight to give medical opinions).

The ALJ should have given at least substantial weight to Dr. Kennedy's opinions as to
Plaintiff's limitations in sitting, standing, and lifting; her inability to twist, stoop, bend, and crouch;
her need to be able to shift positions at will from sitting, standing, or walking; her need to take 1
to 2 unscheduled breaks per day; and the likelihood her impairments would cause her to be absent
about twice a month.  Or, because Dr. Kennedy's treating source statement is admittedly internally
inconsistent as discussed above with respect to his conclusion that Plaintiff would not have
difficulty working a full-time job on a sustained basis, the ALJ should have sought additional
evidence from Dr. Kennedy to resolve this conflict.  Although the determination whether Plaintiff
can work a full-time job on a sustained basis is reserved for the ALJ rather than a treating
physician, Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010), 20 C.F.R. § 404.1527(d), the
ALJ "must not substitute [her] opinions for those of the physician."  Finch v. Astrue, 547 F.3d
933, 938 (8th Cir. 2008) (quoted case omitted).

The ALJ found Plaintiff's testimony about the intensity, persistence, and limiting effects
of her symptoms to be "somewhat inconsistent with the evidence."  (Tr. 22).  The Court defers to
the ALJ's credibility determination if it is supported by good reasons and substantial evidence.
Bryant v. Colvin, 861 F.3d 779, 782-83 (8th Cir. 2017).   Here, some of the ALJ's cited
inconsistencies are only inconsistencies because the ALJ made negative inferences against
Plaintiff.  For example, the first cited inconsistency is that Plaintiff "testified that her mother takes
her to every single appointment but she also told her providers that her mother no longer helps her
as much."[8]  (Tr. 22).  Both of these statements can be true at the same time, however, as Plaintiff's

_____

[8]Plaintiff testified, "Every single appointment, other than my physical therapy, my mom goes with
me.  And she watches my son while I do go to physical therapy without him."  (Tr. 49)

mother could have been helping her in ways other than driving her to appointments and reduced the non-driving help.  The ALJ also found inconsistency in Plaintiff's testimony that she "maybe" carried her baby in his pumpkin seat and placed him in the car by herself twice (Tr. 49), because "treating records indicated that the claimant reported difficulties getting her son in and out of the car with the 'pumpkin seat', which suggests this was not a once or twice occurrence."  (Tr. 22)  The Court's review of the treatment records indicate Plaintiff mentioned this one time at a PT appointment on September 27, 2018, and the treatment note does not indicate how many times Plaintiff stated she placed her baby in the car.  The ALJ's negative inference in this respect therefore does not appear well supported by evidence.

The ALJ also found inconsistent Plaintiff's testimony that her husband works full time and she stays home with their infant son and needs to lay down approximately six to eight times per day because of her back, because Plaintiff "does not have someone who comes into her home on a regular basis to help with her or her infant."  (Tr. 22)  The ALJ did not ask Plaintiff whether she had tried to find anyone to help, or whether she could afford to hire someone to help.  In the absence of such information, the ALJ's finding of an inconsistency is not well supported by evidence, as Plaintiff's testimony could also reflect the status of a family that has not yet been forced to make alternative arrangements for childcare, or a family that has no other options.[9]

The ALJ also found Plaintiff's testimony inconsistent because "she testified they will be moving [the baby] to an upstairs bedroom in spite of her reports of pain with mobility."  (Tr. 22)  This misstates Plaintiff's hearing testimony.  Plaintiff testified the baby was currently in a bassinet in the couple's bedroom and "eventually, you know, our main concern is me getting upstairs with him if he moves up to his bedroom."  (Tr. 43) (emphasis added).  Plaintiff's testimony expresses

---

[9]Plaintiff testified that her pregnancy was unexpected.  (Tr. 43)

recognition of the difficulties she would face if she and her husband did move the baby upstairs to where his room is, but does not express that they had made the decision to move him upstairs or intended to do so.

As previously noted, the ALJ repeatedly mentioned as an inconsistency that Plaintiff drove an hour to the hearing with her husband as a passenger, but Plaintiff also testified she drove herself to PT appointments.  The ALJ's Decision does not explain how Plaintiff's ability to drive for one hour on one occasion establishes an inconsistency, or establishes that Plaintiff can sit for eight hours a day in a sedentary job on a regular basis.

Finally, the ALJ cited as an inconsistency that Plaintiff last took prescription pain medication the week prior to the hearing and does not use assistive devices to ambulate.  (Tr. 22) While the ability to manage without pain medication is certainly relevant to the existence or non-existence of a disability, or to the level of pain a person experiences, the ALJ did not mention that Plaintiff also testified she has taken Percocet for 15 years and "won't take them every day unless [she] absolutely has to."  (Tr. 52)  Plaintiff stated, "I, literally, only take them when I'm in kind of emergency-room pain, which is what I was in," and testified she was in that kind of pain when she took medication for three days in the week prior to the hearing.  (Tr. 52)  The record includes substantial  information concerning Plaintiff's history of pain medication use, her long-term treatment by a pain management physician, and Dr. Kennedy's opinion that Plaintiff's limitations would cause her to have good days and bad days.  Under these circumstances, the ALJ did not adequately support her findings as to the impact of Plaintiff's intermittent use of pain medication on the intensity, persistence, and limiting effects of her condition.  Nor did she explain why Plaintiff's failure to use an assistive device was relevant in the context of Plaintiff's particular limitations.

For these reasons, the Court finds that the ALJ's credibility findings as to Plaintiff's testimony are not supported by good reasons and substantial evidence, such that the identified inconsistencies are a valid reason to discount Dr. Kennedy's opinions.

In sum, the Court concludes the ALJ's decision to afford only "some weight" to Plaintiff's treating neurosurgeon Dr. Kenney's medical source opinion is not supported by substantial evidence on the record as a whole.

B.  The ALJ's RFC Determination

Plaintiff also asserts the ALJ erred in determining her residual functional capacity because she did not include Plaintiff's limitations as described by Dr. Kennedy, which the vocational expert testified would preclude competitive employment.

> An ALJ determines a claimant's RFC 'based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'"  Combs [v. Berryhill], 878 F.3d [642] at 646 [(8th Cir. 2017)] (alteration in original) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004).  "[A] claimant's RFC is a medical question[.]"  Id. (quoting Steed v. Astrue, 524 F.3d 872, 875 (8th Cir. 2008)).  Therefore, the ALJ must use "some medical evidence of the claimant's ability to function in the workplace" in order to make a proper RFC assessment; "[t]he ALJ may not simply draw his own inferences about [the claimant's] functional ability from medical reports."  Id. (cleaned up); see Hutsell [v. Massanari], 259 F.3d [707] at 712 [(8th Cir. 2001)] (explaining that the ALJ erroneously relied on doctors' notes that their patient "was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity").

Koch v. Kijakazi, 4 F.4th 656, 667 (8th Cir. 2021).

Because the Court has determined that the ALJ erred in failing to give appropriate weight to Dr. Kennedy's opinions, it concludes the ALJ's RFC was not based on substantial evidence, as it is not consistent with the relevant evidence of record and does not include limitations identified by Dr. Kennedy.  In determining a claimant's RFC, the ALJ may not disregard evidence or ignore potential limitations.  McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011).

## V. Conclusion

For the reasons stated above, the ALJ's Decision was not supported by substantial evidence.  Because the current record does not conclusively demonstrate that Plaintiff is disabled, it would be inappropriate for the Court to award Plaintiff disability benefits at this time.  A remand to the Commissioner is warranted for further administrative proceedings to permit the ALJ to resolve the inconsistency present in treating neurosurgeon Dr. Kennedy's opinions.  In doing so, the ALJ should obtain additional information directly from Dr. Kennedy, and may conduct supplemental medical examinations if appropriate.  Plaintiff should be afforded a reasonable opportunity to supplement the medical evidence.  The ALJ shall reassess Plaintiff's credibility in accordance with the factors set forth in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984), and shall consider all of the evidence relevant to Plaintiff's subjective complaints. The ALJ must then revisit the RFC assessment and formulate a new RFC determination that includes all of Plaintiff's limitations that are supported by substantial evidence in the record.

While the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undergoing the required analysis, such determination is for the Commissioner to make in the first instance.  <u>See</u> <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 569 (8th Cir. 1999).   If the ALJ determines on remand that Plaintiff is not disabled, she shall also consider whether Plaintiff is entitled to a closed period of disability during the period leading up to and including her two back surgeries.

Accordingly,

**IT IS HEREBY ORDERED** that Kilolo Kijakazi is substituted as Defendant in this action for Andrew Saul under Rule 25(d), Fed. R. Civ. P., and the Clerk of the Court shall modify the docket sheet and short title of the case to reflect this substitution.

**IT IS FURTHER ORDERED** that the decision of the Commissioner is **REVERSED**, and this case is **REMANDED** to the Commissioner under Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.


_Ronnie L. White_
**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**


Dated this <u>10th</u> day of September, 2021.